**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**KURTIS CLARK, et al.,**

**Plaintiffs,**

**v.**

**JOSHUA YOUNG, et al.,**

**Defendants.**

**Case No. 2:26-cv-572**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Shimeall**

**OPINION AND ORDER**

What started as a spat about a fence has now morphed into a civil rights dispute spanning two federal lawsuits. Around March 5, 2025, plaintiffs Kurtis Clark and Julie Scott noticed that their neighbor, Timothy Warnock, had erected a fence that sits in part on their property. *See* Complaint at #4, *Clark v. Vill. of S. Solon*, No. 2:25-cv-462 (S.D. Ohio, Apr. 29, 2025). Clark and Scott called the police. *Id.* They contend that their call triggered "a campaign of harassment" from Warnock and several government officials from the Village of South Solon, where all three live. *Id.* at #6. So the couple sued Warnock, the Village, and two Village officials. *See generally id.* But that's a different case before this Court, which is still ongoing. *Id.*

This action, by contrast, centers on what happened *after* they filed that suit. Specifically, Clark and Scott allege that the nine individual defendants here—some of whom are government officials, some not—and the Village of South Solon retaliated against them for suing. (Am. Compl. Doc. 27, #507). Based on that retaliation, Clark and Scott assert five federal claims under 42 U.S.C. § 1983 and four Ohio-law claims, along with a request for prospective declaratory and injunctive

relief. (*Id.* at #549–66). If everything they allege is true, the defendants tried to damage the couple's relationship with one of their business associates, selectively enforced local ordinances against them, and published information about Clark's criminal history, all to punish Clark and Scott for suing. (*See generally* Doc. 27).

Clark and Scott have now moved for a temporary restraining order (TRO) and preliminary injunction, requests which they say are "narrow." (Doc. 21, #391). Specifically, during the pendency of this action, they want the Court to prohibit defendants from (1) publicly discussing or disclosing information about Clark's former name or criminal history, (2) contacting Clark and Scott's employers or business affiliates, (3) retaliating against Clark or Scott, or (4) destroying any records related to this or the other action. (Doc. 21, #403–405).

For the reasons discussed below, the Court **DENIES** Clark and Scott's motion for a temporary restraining order and preliminary injunction. (Doc. 21).

## BACKGROUND[1]

As the Court noted above, this all started with a fence. Or more accurately, it mostly started there. The timeline is muddy, but it seems Clark and Scott may have

[1] Because TROs and preliminary injunctions are provisional remedies meant only to preserve the status quo, the Court must reach a decision using "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In other words, the typical strictures of the Federal Rules of Evidence don't apply with as much force. *Damon's Rests., Inc. v. Eileen K Inc.*, 461 F. Supp. 2d 607, 620–21 (S.D. Ohio 2006). So the Court "may consider the entire record, including affidavits and other hearsay evidence." *Ramirez v. Bullock*, No. 3:26-cv-888, 2026 WL 1910251, at *4 (M.D. Tenn. July 2, 2026); *see Brown v. City of Upper Arlington*, No. 2:08-cv-849, 2008 WL 4758689, at *4 (S.D. Ohio Oct. 29, 2008) (collecting cases). The materials the Court relies upon must only be "appropriate given the character and objectives of the injunctive proceeding." *McLaughlin v. Pierce*, No. 3:26-cv-303, 2026 WL 755367, at *5 (M.D. Tenn. Mar. 17, 2026). Thus, the Court reminds the reader that that no finder of fact has determined

been in a simmering dispute with their neighbor, Timothy Warnock, since at least 2023, when Scott first moved to the Village of South Solon. (Civ. Prot. Order Hr'g Tr., TRO Ex. 7, Doc. 14-7, #249–53). Sometime during the course of those troubles, Clark and Scott decided to build a fence, perhaps hoping to take advantage of one poet's suggestion that good fences make good neighbors.[2] (*Id.* at #247–48). Warnock responded by building a fence of his own. (*Id.*). That is when the problem arose: Warnock's fence was "4 to 5 inches off the property line." (*Id.* at #248). That is not inherently troublesome until you add one more fact—the "4 to 5 inches" was not to Warnock's side of the line. (*Id.*). In short, Warnock had built a portion of his fence on Clark and Scott's land. That brought the long-simmering dispute to a rolling boil.

### A. The Neighborhood Dispute Escalates into the First Lawsuit.

Clark and Scott called law enforcement, hoping that police officers would compel Warnock to remove his fence from their property. Complaint at #3, *Clark v. Vill. of S. Solon*, No. 2:25-cv-462. That didn't work. *Id.* at #4. True, it spurred a response from Warnock, but not their desired one. Instead of moving his fence, Warnock and another one of Clark and Scott's neighbors, then-Village Council member James A. Doughty, Jr., began to (allegedly) accost the couple in public with harsh language. *Id.* at #3–6. They were also "playing their music loudly, beeping their horns, revving engines" and generally doing "anything that they [could] think of"

---

whether the background "facts" discussed in this opinion (which really are just assertions at this point) are true.

[2] Robert Frost, *Mending Wall* (1914), https://poets.org/poem/mending-wall [https://perma.cc/SFZ6-ZPY6].

outside the couple's home to harass them. (Doc. 14-7, #248–49). Compounding the problem, they reportedly engaged in this conduct with the approval of then-Village Mayor Damien Grube. Complaint at 8*, Clark v. Vill. of S. Solon*, No. 2:25-cv-462.

Things progressed rapidly. By April 2025, just a month after the fence dispute started, Scott had requested a civil protection order (CPO) against Warnock from the Ohio Court of Common Pleas for Madison County. (*See generally* Doc. 14-7). That court denied her request, though, noting that being a "bad neighbor … doesn't rise to the level of a crime." (*Id.* at #252–53). Though he did not have the opportunity to speak much at the CPO hearing, Warnock noted that he "brought the mayor" to the meeting as a witness. (*Id.* at #255).

Unsuccessful in state court, Clark and Scott turned to federal court, filing a civil rights action against Warnock, the Village, Grube, and Doughty on April 29, 2025. *See generally* Complaint, *Clark v. Vill. of South Solon*, No. 2:25-cv-462. They raised thirteen claims, some arising under 42 U.S.C. § 1983 and others under Ohio law. *Id.* The basic gist of that lawsuit is Clark and Scott's claim that the defendants there retaliated against them for seeking a CPO against Warnock in state court and for speaking out about ongoing misconduct within the Village. *Id.* at #11–12. As the Court noted above, that suit remains pending.

**B. The Village Reacts to Clark and Scott's First Lawsuit.**

South Solon is a small village, so word of Clark and Scott's suit spread quickly; soon the village was abuzz with gossip on social media. (Doc. 27, #514–16). And the other residents of South Solon were not sympathetic to Clark and Scott's alleged

plight. (*Id.*). To the contrary, they "expressed a desire to drive Plaintiffs out of the courthouse or out of the Village." (*Id.* at #515). These sentiments, Clark and Scott allege, manifested in three particular incidents, each of which they claim show that the Village and its officials retaliated against them for suing.

**1. The April 2026 Truck Ordinance Incident.**

The first incident involves communications between Village officials and one of Clark's business associates. Clark works as a contractor for a company called Elevation Transfer LLC. (Compl. Ex. 1, Doc. 1-2, #34; Compl. Ex. 6, Doc. 1-7, #45). Clark doesn't offer many details about what his work entails, but it is clear that it requires him to lease a sizeable truck from the company. (Compl. Ex. 6, Doc. 1-7, #45). Someone named Weston Baker owns both the company and the truck. (*See* Scott Decl., Doc. 1-21, #90).

On April 14, 2026, Jordone Rittenhouse—South Solon's Clerk, Fiscal Officer, and Treasurer—reached out to Baker using the official Village of South Solon email. Her email purported to speak "on behalf of the Village," and included Mayor Young on the email chain. (Compl. Ex. 1, Doc. 1-2, #34). Rittenhouse informed Baker that "one of [Baker's] employees" was using "oversized trucks on village roads" in violation of "posted signage." (*Id.*; *see* Compl. Ex. 9, Doc. 1-10, #51). This, Rittenhouse relayed, "may result in legal action against the owner of the vehicle." (Doc. 1-2, #34). From context, it appears that the "employee" Rittenhouse referenced was Clark, and that the "owner of the vehicle" was Baker. (*See* Clark Compl. Decl., Doc. 1-22, #101). To support her assertion, Rittenhouse attached to her email photos and video of a large

dump-truck driving in front of Clark and Scott's home. (*Id.*; Compl. Ex. 12, Doc. 1-13, #59). She obtained those materials from Doughty, who has a security camera over his garage overlooking Clark and Scott's property. (Doc. 1-22, #104–05).

In a later Facebook post, Rittenhouse confirmed that she sent the email "at the direction of the Mayor and Village Council," though she took care to note that she would never "contact someone's employer out of spite or for vindictive reasons." (Compl. Ex. 4, Doc. 1-5, #41). Mayor Young also supposedly called Baker to discuss the matter—and, apparently, Clark and Scott's suit against the Village—at some point. (Doc. 1-22, #101–02; *see* Compl. Ex. 10, Doc. 1-11, #53).

Baker also forwarded the Village's email to Clark. (Doc. 1-22, #101). On April 15, 2026, Clark responded by reaching out to Mayor Young and asking him to identify the specific ordinance he believed Clark had violated. (*Id.* at #102). The Mayor directed Clark to § 904.04 of the Village's ordinances, which makes it a minor misdemeanor to "operate a vehicle exceeding … a gross weight of five tons upon any street in the Village," unless "necessary to load or unload property, to go to or from the usual storage of such vehicle or to perform any other legitimate business or act other than passage through the Village." (Compl. Ex. 9, Doc. 1-10, #51; Doc. 1-22, #103). Clark argued that the ordinance did not apply to him because he was using the truck to load and unload property from his home and, more generally, for other "legitimate business activity" in the Village. (Doc. 1-22, #103). The Village responded eleven days later, on April 27, 2026, by enacting a new ordinance that more directly covered Clark's truck use by making it unlawful to operate a truck weighing more

than ten tons on North Street, where Clark and Scott live. (Doc. 1-22, #104; Compl. Ex. 11, Doc. 1-12, #55–57 (attaching ordinance)).

### 2. The May 2026 Burnout Incident.

Troubled by the Village's contact with Baker and the enactment of the new ordinance, Clark sent Mayor Young a demand letter on April 30, 2026. There he commanded the Village and its officials to cease and desist from a variety of ostensibly retaliatory conduct. (Compl. Ex. 14, Doc. 1-15, #68). That letter also instructed the Village to preserve various documents related to the truck incident described above. (*Id.*). Perhaps not surprisingly, the letter did not mend any proverbial fences. To the contrary, on May 9, 2026, Clark and Scott say their outdoor surveillance camera captured a video of Doughty driving by their house on a motorcycle, revving his engine, and "doing a burnout" that left "a black mark on the roadway." (Doc. 1-22, #107; Compl. Ex. 16, Doc. 1-17, #73–74). Clark and Scott further claim Doughty appeared intoxicated. (Doc. 1-22, #107). Shortly after that, former Mayor Damien Grube—whose voice Clark and Scott recognized—allegedly yelled a homophobic slur toward their house as he entered Doughty's property, loudly revving the engine of his own vehicle. (*Id.*). They also heard someone (they don't say whom) make "statements about blowing up [their] vehicle and hurting [them]." (*Id.*).

### 3. The June 2026 Criminal History Incident.

Sometime in early June 2026, Mayor Young received a notification from United States Probation and Pretrial services that someone named "Kurtis Armann" was living at Clark and Scott's address and that Armann had a criminal history. (Clark

TRO Decl., Doc. 14-4, #223; TRO Ex. 1, Doc. 14-1, #212). Supposedly, the notification was "for law enforcement use only," and "was not intended for public posting … or neighborhood dissemination." (Doc. 14-4, #223 (capitalization altered)). Wanting more information, the Mayor reached out to Officer Chris Robards, who the Court infers was listed on the notice as a contact. (*See* Doc. 14-1, #212). Robards revealed that "Armann" was Clark's former name and that he was under federal supervision for a prior offense. (Doc. 14-4, #223–24). He assured the Mayor that Clark wasn't a threat and that he had complied with his supervised release conditions for thirteen years. (*Id.*; Doc. 14-1, #212).

Somehow, though, other Village residents soon learned about Clark's former name and his prior offense. Some then took to a private Facebook thread to discuss. (Doc. 21, #396). Former Mayor Grube, for example, commented that Clark was "Mr murder for hire" and another Village resident, Christie Jennings Burba, called him a "serial killer" and a "murder[er]." (TRO Ex. 3, Doc. 14-3, #217–20). Most in the thread indicated that they weren't comfortable with Clark living in the Village. (*Id.*). The current mayor—Mayor Young—noted in an email to Clark that these comments were "uncalled for," "[i]mmature," "stupid," and "childish." (Doc. 14-1, #212). He "apologize[d] for their behavior," but stood firm that he was "not the village babysitter" and had no control over the views expressed on the page. (*Id.*).

On June 12, 2026, Clark sent Mayor Young a public records request for the probation notification and any communications between Village officials and the Facebook posters. (Doc. 14-1, #211). As for the latter, Mayor Young replied that no

such communications existed. And, while he acknowledged he had the probation notification in his possession, he claimed it was not subject to Ohio's public records statute because it did not "document the organization, functions, policies, decisions, procedures, operations or activities of the Village" and because it could constitute "confidential law enforcement records." (*Id.* at #212; TRO Ex. 2, Doc. 14-2, #214). Clark responded that he would obtain the notice through other means, (Doc. 14-2, #214), but it doesn't appear that he was able to do so, (Doc. 14-4, #223).

**C. This Action.**

Around a month before sending the public records request the Court described above, Clark and Scott also filed this action. (Doc. 1). Not long after, on June 24, 2026, they filed an emergency motion for a temporary restraining order and a preliminary injunction. (Doc. 14). But those versions of their complaint and TRO and preliminary injunction motion were short lived. The defendants answered on June 25, 2026, (Doc. 15), and then moved to strike the TRO/PI motion because it exceeded the page limitations set out in the Court's standing orders, (Doc. 16). In response, Clark and Scott moved for leave to correct their motion (Doc. 17) and later also moved to amend their complaint (Doc. 23). The Court, acting through the then-assigned Judge, granted both motions for leave. (Docs. 20, 26). So Clark and Scott filed their corrected motion for a TRO and preliminary injunction (Doc. 21) and an amended complaint (Doc. 27).

The amended complaint names ten defendants: the Village, Mayor Young, Jordone Rittenhouse, former mayor Grube, former councilman Doughty, four

members of the Village Council—Dylan Rittenhouse, Roger Sparrow, Richard Hoover, and Melissa Crabbe—and Christie Jennings (Burba), who was one of the Facebook posters. (Doc. 27, #507, 510–12). Clark and Scott sued Young and Jordone Rittenhouse in both their individual and official capacities; they sued the remaining individual defendants in only their individual capacities. (*Id.*).

Though Clark and Scott raise ten different claims, their TRO and preliminary injunction motion relates only to their First Amendment retaliation claim. (*Id.* at #549; Doc. 21, #392). On that front, they ask the Court to issue an order prohibiting the Village, Young, Jordone Rittenhouse, Dylan Rittenhouse, Sparrow, Hoover, Crabbe, and Doughty from carrying out "further official or quasi-official disclosure or retaliatory use of nonpublic supervision or law-enforcement information, retaliatory third-party contacts, encouragement of harassment, [and] destruction of relevant evidence." (Doc. 21, #392). The defendants responded (Doc. 29) and Clark and Scott replied (Doc. 32).

In early October 2026, the case was reassigned to the undersigned. And with that, this matter is ripe for the Court's consideration.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 65 empowers the Court to issue TROs and preliminary injunctions. Both are extraordinary measures meant only to preserve the status quo, which is "the last actual, peaceable, noncontested status [that] preceded the pending controversy." *Oruganti v. Noem*, No. 2:25-cv-409, 2025 WL 1144560, at *2 (S.D. Ohio Apr. 18, 2025) (citation modified). The Court refers to them as

extraordinary measures because they are among "the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Tr. PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)).

Whether to issue injunctive relief "falls within the sound discretion of the district court." *Ohio A. Phillip Randolph Inst. v. Husted*, 350 F. Supp. 3d 662, 670 (S.D. Ohio 2018). In exercising that discretion, whether as to a TRO or a preliminary injunction, the Court must consider four factors. *See Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006). Those factors are whether: (1) the movant has a substantial likelihood or probability of success on the merits, (2) the movant will suffer irreparable injury if the court does not grant relief, (3) injunctive relief would unjustifiably harm a third party, and (4) injunctive relief would serve the public interest. *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985).

But in First Amendment cases like this one, "the likelihood of success on the merits often will be the determinative factor" because "even minimal infringement upon First Amendment values constitutes irreparable injury" and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *see Rice v. Schell*, 831 F. Supp. 3d 647, 654 (S.D. Ohio 2026) (collecting cases). Thus, the TRO and preliminary injunction analysis in First Amendment cases typically collapses into an investigation of the movant's likelihood of success on the merits. *E.g.*, *Ent. Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 377 (6th Cir. 2009). To show a likelihood of success on the merits, the movant must raise "questions going to the merits so serious,

substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007).

Moreover, the party moving for the TRO or preliminary injunction—here Clark and Scott—must "demonstrate a right to injunctive relief by clear and convincing evidence" *totes Isotoner Corp. v. R.G. Barry Corp.*, No. 2:13-cv-0253, 2013 WL 2468357, at *3 (S.D. Ohio June 7, 2013); *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 860 (S.D. Ohio 2008). That in turn means that plaintiffs "may not merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations." *Patel v. AR Grp. Tenn., LLC*, No. 3:20-cv-52, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020) (collecting cases).

**LAW & ANALYSIS**

As the Court alluded to above, whether Clark and Scott are entitled to a TRO or preliminary injunction boils down to whether they have clearly demonstrated that their First Amendment retaliation claim has a substantial likelihood of success on the merits. *Connection Distrib. Co.*, 154 F.3d at 288. To answer that question, the Court considers each of the alleged acts of retaliation individually and concludes that Clark and Scott are not likely to succeed on a First Amendment retaliation claim related to any of them, whether considered alone or in conjunction.

### A. The Elements of a First Amendment Retaliation Claim.

Start by considering what Clark and Scott would need to demonstrate to succeed on their First Amendment retaliation claim. That claim has three elements: (1) the plaintiff engaged in "constitutionally-protected conduct," (2) the defendant carried out some adverse action "sufficient to deter a person of ordinary firmness from continuing to engage in that conduct," and (3) a causal connection between the constitutionally-protected conduct and the adverse action—or in other words that "the adverse action was motivated at least in part by plaintiff's protected conduct." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 207 (6th Cir. 2010).

In addition, there is one antecedent requirement: "a plaintiff must ... show that the alleged violation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). In other words, "First Amendment protections are triggered only in the presence of state action." *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007). A private party acting on their own accord "cannot ordinarily be said to deprive a citizen of [their] right to Free Speech." *Id.*[3]

All of Clark and Scott's retaliation theories easily clear the first element set forth above. The conduct in which they engaged—suing the Village and its officials—

[3] Clark and Scott also contend that they are likely to succeed on the merits of their First Amendment retaliation claim against the Village under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the Village "had notice of repeated official or Village-linked retaliation and failed to investigate, correct, discipline, disavow, or preserve relevant evidence." (Doc. 21, #401). But apart from those conclusory statements, they offer nothing that shows the Village likely has a "policy or custom" of allowing retaliation. *Monell*, 436 U.S. at 694. *Monell* boilerplate is not enough to justify an injunction. Without more evidence to consider, the Court finds that Clark and Scott are not likely to succeed on the merits of their *Monell* claim and so denies their request for a TRO and preliminary injunction on that front.

is a First Amendment-protected form of "petition[ing] the Government for redress of grievances." U.S. Const. amend. I; *Nicholson v. City of Westlake*, 76 F. App'x 626, 628 (6th Cir. 2003). However, as the Court discusses below, they run into difficulty on all of the remaining elements.

### B. Clark and Scott Are Not Likely to Show a Causal Connection Between their Suit and the Village's Contact with Baker or that the Village Council Defendants are Liable for Enacting the New Truck Ordinance.

Clark and Scott's first First Amendment retaliation theory posits that Mayor Young and Jordone Rittenhouse retaliated against them by reaching out to one of their business associates (Baker), and that the Village councilmember defendants retaliated against them by enacting a local ordinance that prohibited Clark and Scott from using their large truck on Village roads. (Doc. 1-22, #104–05). Neither theory is likely to succeed on the merits.

Start with Rittenhouse and Mayor Young's communications with Baker. Clark and Scott say Rittenhouse and Young sought to damage their relationship with Baker by threatening to enforce a local ordinance against him, and that they did so as punishment for Clark and Scott's first lawsuit. (*Id.*). And in fairness to Clark and Scott, government officials have, on rare occasions, been known to retaliate against an individual speaker by threatening to enforce regulations against one of their business associates. *See Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175, 203–04 (2024) (Jackson, J., concurring). The problem in such settings, though, is that it is often difficult to separate out retaliatory acts done to punish a plaintiff, on the one hand, from "unexceptionable" enforcement measures carried out for legitimate,

nonretaliatory reasons. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Given concerns about courts interfering with normal legislative and law enforcement operations, plaintiffs raising such claims face a high bar. They must show both that officials had a "retaliatory motive" and that this motive was the "but-for cause" of their acts, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019).

Clark and Scott don't get very far on either front. Timing alone is not enough. *See Sensabaugh v. Halliburton*, 937 F.3d 621, 630 (6th Cir. 2019). And they offer nothing beyond timing to show either motive or that their suit was the but-for cause of Rittenhouse and Young's decision to communicate with Baker. On their face, the communications involve simple local-ordinance enforcement. (Doc. 1-2, #34). They don't even mention Scott or Clark. (*Id.*). True, Rittenhouse's subsequent Facebook post does mention the couple, but it also provides a neutral reason for her decision to pursue enforcement of the ordinance: The street was "in poor condition" and allowing residents to drive a "12+ wheel, 10+ ton truck" would "accelerate deterioration significantly." (Doc. 1-5, #41). So the evidence on motive is murky at best.

But imagine that all is as Clark and Scott allege, and that Rittenhouse and Young in fact wanted to retaliate against them for suing. That would show motive, but it still wouldn't be enough to establish causation. *Nieves*, 587 U.S. at 398. That is because Clark and Scott haven't shown anything to suggest that Rittenhouse and Young would've refrained from threatening to enforce the ordinance against Baker but-for that allegedly retaliatory motive. *Id.* Without any showing on but-for

causation, the Court cannot say that Clark and Scott's third-party contact theory is likely to succeed on its merits.

Clark and Scott's theory that the Village councilmembers retaliated against them by passing a new truck ordinance meets the same fate, but for a different reason. "[L]ocal legislators are … absolutely immune from suit under § 1983 for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998). That remains true even when a plaintiff's "protected speech was a substantial or motivating factor behind" the legislation and when the legislature "specifically targeted" the plaintiff. *Id.* at 54. Here, there is no room to dispute that the Village council's enactment of the new ordinance was "in the sphere of legitimate legislative activity." *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951). "[V]oting for [an] ordinance" is a "quintessentially legislative" activity. *Bogan*, 523 U.S. at 55. Thus, Clark and Scott aren't likely to succeed on their selective legislation theory, either.

### C. Defendants Doughty and Grube were Not Government Officials During the May 2026 Burnout Incident.

Turn to Clark and Scott's next First Amendment retaliation theory. They say that former councilman Doughty retaliated against them by "doing a burnout" on their street and that former mayor Grube retaliated against them by yelling a homophobic slur toward their home. (Doc. 1-22, #107). Clark and Scott also claim they heard someone make "statements about blowing up [their] vehicle and hurting [them]." (*Id.*).

This theory of First Amendment retaliation runs headlong into the state action doctrine. Note that these were *former* officials—it does not appear that either

Doughty or Grube held any positions of power within the Village government when these incidents occurred. (Doc. 27, #511–12). As private parties, neither defendant was acting under color of state law when they created loud noises and hurled distasteful comments toward Clark and Scott's home. *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007). So Clark and Scott's First Amendment retaliation claim against Grube and Doughty for those incidents under 42 U.S.C. § 1983 does not have a substantial likelihood of success on the merits.

**D. Clark and Scott Are Not Likely to Show that the Defendants Published Clark's Criminal History Information.**

Clark and Scott's only remaining theory is that the Village and its officials retaliated against them by leaking Clark's former name and criminal history to the public. (Doc. 21, #400). On that front, Clark and Scott have shown that, a few months after they sued, the Village received a notification from United States Probation and Pretrial Services that contained Clark's former name and offense history and that, a short time later, the public started ridiculing Clark for that history on Facebook. (Doc. 14-4, #222–25). While that sequence of events is troubling, "temporal proximity alone is rarely, if ever, sufficient to establish causation." *Sensabaugh*, 937 F.3d at 630).

But temporal proximity is about all that Clark and Scott offer. They have shown three separate events: their suit, the Village's receipt of the Probation Services notification, and the villagers' disparaging Facebook comments. They haven't shown any connection between those events beyond temporal proximity, nor have they shown that that the Village itself took *any* action related to the Probation Services

notification (as described below, the information was publicly available), let alone an action that counts as "adverse." That poses a problem for their chances of success on their retaliation claim, the necessary elements of which will require them to demonstrate both that the Village or its officials took some adverse action against them and that the adverse action was causally related to their first suit. *Eckerman*, 636 F.3d at 207.

Start with the adverse action element. Admittedly, the public disclosure of a plaintiff's *private* information can, at least in some circumstances, constitute an adverse action for First Amendment retaliation purposes. *See Bloch v. Ribar*, 156 F.3d 673, 679–81 (6th Cir. 1998). The Court is not sure, though, whether someone's former name and information relating to their criminal history, both of which are matters of public record, count as "private information." *See Hutchins v. Clarke*, 661 F.3d 947, 952–56 (7th Cir. 2011) (holding that the disclosure of past disciplinary history was not an adverse action when that information was publicly available). At the same time, the Court could imagine that publication of information like this, which would paint a party in a bad light, may be actionable even if the information is not private. Concerningly, though, the parties have not provided any case law addressing either of those issues, nor has the Court found anything directly on point. So, right out of the gate, the Court has at least some concerns about the viability of Clark and Scott's First Amendment retaliation theory. That said, the adverse action standard is general—whether the action would "deter a person of ordinary firmness" from engaging in First Amendment-protected conduct—and as noted it is at least

conceivable that a plaintiff could succeed on a retaliation claim by pointing to a government official's publication of their former name and criminal history information. *Eckerman*, 636 F.3d at 207.

Nonetheless, Clark and Scott have a more fundamental problem. They *say* that Village officials leaked the probation notification to the public, but they offer no actual *evidence* to substantiate that allegation. (Doc. 21, #398–99). In an email to Clark, Mayor Young denied that the Village leaked the information, maintained that he had "no clue" how the public learned of Clark's former name and prior offense, and condemned the Facebook comments as "stupid and childish." (Doc. 14-1, #212). Sure, one might be tempted to ask, "how else could the information have gotten out?" But defendants have an answer on that front, too—as noted above, information about Clark's former name and his prior offense is publicly available online. (Doc. 29, #580 n.2). So maybe they are right that it was Village officials who leaked the information. But perhaps, as events unfolded that thrust Clark and Scott into the public eye, another Village resident simply stumbled across Clark's information on the internet. At this point, who knows? What is certain is that Clark and Scott's unsupported allegations that the Village and its officials leaked Clark's information aren't the kind of clear and convincing evidence that would cause the Court to issue an injunction, one of "the most drastic tools in [its] arsenal of judicial remedies." *Bonnell*, 241 F.3d at 808 (quoting *Hanson Tr. PLC*, 781 F.2d at 273). Without something more, the Court cannot say that Clark and Scott have affirmatively demonstrated it is likely they will be able to show that the Village or its officials took adverse action against

them related to the Probation Services notification. *Patel,* 2020 WL 5849346, at *4 (collecting cases).

What's more, Clark and Scott also fail to clear the causation hurdle. That is, even if they had presented some evidence to suggest that one of the Village officials disclosed Clark's former name and criminal history to the public, there is nothing before the Court suggesting that any such disclosure was connected to Clark and Scott's first lawsuit. True, the Facebook comments started after Clark and Scott sued and the Village received the probation notification. But, again, "[t]he mere proximity in time of the allegedly retaliatory act to the plaintiff's exercise of his constitutional right is not enough to establish causation." *Jones v. City of Allen Park*, 167 F. App'x 398, 408 (6th Cir. 2006); *Sensabaugh*, 937 F.3d at 630; *Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 332 (6th Cir. 2003) (same). And, again, temporal proximity is all Clark and Scott bring to the table. (Doc. 32, #588). So for this additional reason, the Court finds that Clark and Scott have not demonstrated a substantial likelihood of success on the merits of their First Amendment retaliation claim as it relates the defendants' alleged publication of Clark's former name and criminal history information.

* * *

In sum, Clark and Scott have not shown a substantial likelihood of success on the merits of any of their First Amendment retaliation theories. And, without a likely violation of their First Amendment rights, they have also not demonstrated that they will suffer an irreparable injury without injunctive relief or that the public interest

favors an injunction. *Connection Distrib. Co.*, 154 F.3d at 288. Thus, their shortcomings on the merits are determinative. *Id.* The Court denies their request for a TRO and preliminary injunction. (Doc. 21).

But the Court would be remiss if it failed to offer a parting observation. While the Court denies Clark and Scott the emergency injunctive relief they seek, it reminds defendants Joshua Young, Jordone Rittenhouse, Dylan Rittenhouse, Roger Sparrow, Richard Hoover, and Melissa Crabbe that, as government officials, they "may need to have thicker skin than the ordinary citizen." *Mattox v. City of Forest Park*, 183 F.3d 515, 522 (6th Cir. 1999). From officials who occupy the meeting rooms of Ohio villages to those who roam the halls of Congress, all who wield state power have an obligation to respect the public's First Amendment right to petition their government—local, state, or federal—for a redress of grievances and "to be free from retaliation for doing so." *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010); *Cooperrider v. Woods*, 127 F.4th 1019, 1040 (6th Cir. 2025). Those defendants should bear those constitutional principles in mind as the litigation on this matter and Clark and Scott's related action proceeds.

## CONCLUSION

For the reasons discussed below, the Court **DENIES** Clark and Scott's motion for a temporary restraining order and preliminary injunction. (Doc. 21).

**SO ORDERED.**

November 23, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**